UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION



FILED

FEB 2 4 2004

CLERK

```
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
                                          *
IN RE IBP, INC.                           *           CIV 01-4031
SECURITIES LITIGATION                     *
                                          *
                                          *      MEMORANDUM OPINION
(Relates to All Actions)                  *          AND ORDER
                                          *
                                          *
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
```

Lead plaintiffs, a group consisting of WPG Merger Arbitrage Fund L.P., WPG Arbitrage Overseas Fund, L.P. and TFM Investment Group, ("Plaintiffs") on behalf of themselves and the preliminarily certified class, moves for final approval of the Stipulation of Settlement filed July 21, 2003 (Doc. 123) and plan of allocation of settlement proceeds, Doc. 135. A fairness hearing was held on December 8, 2003, in accordance with the Court's Order Preliminarily Approving Settlement and Providing for Notice, Doc. 126, entered on July 31, 2003, and with the notice provided to the preliminarily certified class. No objections were filed to the proposed Stipulation of Settlement. In addition, Plaintiffs have requested an award of attorney fees in the amount of 30 percent of the $8 million settlement fund. One objection was received to the request for attorney fees.

One working day before the fairness hearing, Defendants (except Andrew Zahn and Philip Sexauer) faxed a letter to the Court (Doc. 139) raising an issue that the notice sent to the class members differed from the notice approved by the Court on July 30, 2003. Plaintiffs submitted a letter to the Court (Doc. 140) the day of the fairness hearing summarizing the differences between the actual notice sent to class members and the notice previously approved by the Court. The Court addressed the differences during the fairness hearing and required the parties to submit briefs on the issue. Having reviewed the briefs, the Court concludes that although the plan of allocation set forth in the actual class notice differs from the notice approved by the Court on July 30, 2003, the fairness of the settlement should be evaluated based upon the actual class notice.

## BACKGROUND

In this action, Plaintiffs allege Defendants committed securities fraud under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1997) ("the Exchange Act") and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 (2001) ("Rule 10b-5") and that certain Defendants are liable as control persons under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) (1997). On July 30, 2003, the Court preliminarily certified a class, solely for purposes of effectuating the settlement, a Settlement Class of all persons who purchased IBP, Inc. ("IBP") common stock during the period from February 7, 2000 through January 25, 2001, inclusive, and their respective legal heirs, successors, assigns and representatives. Excluded from the Settlement Class are Defendants and their immediate family members as well as those persons who timely opted-out of the settlement. This action is summarized in the Consolidated Amended Class Action Complaint, Doc. 70, ("the Complaint") as:

> [A]gainst IBP and its wholly-owned subsidiaries Foodbrands America, Inc.("Foodbrands") and Diversified Food Group LLC ("DFG") (collectively, the "Company") as well as the Company's senior insiders for intentionally preparing and disseminating false and misleading earnings releases and Securities and Exchange Commission ("SEC") filings relating to the Company's 1999 and interim 2000 financial results, which earnings, releases and SEC filings contained false financial statements that defendants have now admitted were in the aggregate overstated by over $100 million due to the failure of the defendants to properly account for IBP's investment in DFG, as well as for DFG's inventory, receivables and pre-paid assets.

(Complaint ¶ 1.)

During the relevant time period, defendant Robert L. Peterson was the Chairman of the Board and Chief Executive Officer of IBP, Inc. ("IBP"), defendant Richard Bond functioned as President, Chief Operation Officer and a director of IBP and defendant Larry Shipley was the Chief Financial Officer of IBP. Defendant William Brady was the Chief Financial Officer of Foodbrands America, Inc. ("Foodbrands") and defendant Randolph Devening was Foodbrands' Chief Executive Officer and an executive officer of IBP during the class period. Defendant Andrew Zahn was the Chief Executive Officer of Diversified Food Group, LLC ("DFG") and Senior Vice President of Foodbrands. Defendant Philip Sexauer was the Chief Financial Officer of DFG during the relevant time period.

IBP operates beef and pork carcass production facilities to produce a variety of food products in conjunction with its subsidiaries. Foodbrands is a wholly owned subsidiary of IBP engaged in producing value added and high margin food products. DFG is also a wholly owned subsidiary of IBP, consolidated under the Foodbrands umbrella, that produces hors d'oeuvres, prepared meals and desserts. When DFG was acquired in late 1998, the employment agreement with Sexauer and Zahn provided for as much as $40 million of additional compensation between 1999 and 2001, depending upon the level of profits generated for Foodbrands by DFG's assets.

According to Plaintiffs, Zahn and Sexauer were responsible for causing improper accounting entries to be made to DFG's books between October 1998 and September 2000, including millions of dollars worth of fictitious entries to inventory, resulting in reported inventory being artificially inflated. (Complaint ¶ 19.) To cover-up the inflated inventory levels, Plaintiffs allege Zahn and Sexauer repeatedly cancelled physical inventories. (Id.) Plaintiffs further allege Zahn and Sexauer caused DFG not to write-down or reserve for millions of dollars worth of uncollectible accounts receivable, in part by transferring receivables into other assets, causing receivables and earnings to be inflated. (Id.)

Devening and Brady were responsible, according to Plaintiffs, for causing DFG's false financial information to be included in IBP's consolidated financial statements by intentionally disregarding accounting improprieties at DFG. (Complaint ¶ 20.) By November 1999, when an annual internal audit was completed, Plaintiffs allege employees of Foodbrands identified numerous accounts receivables that appeared to be uncollectible and discovered that millions of dollars of suspicious current period expenses had been capitalized as Prepaid Expenses. (Id.) Plaintiffs contend Devening and Brady "refused to verify that the expenses were written off." (Id.)

Peterson, Bond and Shipley were informed of the accounting problems at DFG, according to Plaintiffs, by at least mid-October 2000. (Complaint ¶ 21.) The public was told in November 2000 that there was a $9 million problem relating to DFG. But Plaintiffs contend Peterson, Bond and Shipley knew by December 11, 2000 that there was at least another $20 to $25 million that

3

needed to be written off and the public was not informed of this additional problem until January 25, 2001. (Id.)

Plaintiffs allege Foodbrands, DFG, Zahn, Sexauer, Devening and Brady knew or recklessly disregarded that IBP's releases and filings with the Securities and Exchange Commission ("SEC") regarding IBP's financial condition and performance for fiscal year 1999 and the first two quarters of 2000 were materially false and misleading when issued. (Complaint ¶¶ 26-33, 41.) These releases and filings were made between February 7, 2000 and October 16, 2000.

On October 16, 2000, IBP released its third quarter results announcing earnings of $83.9 million and $0.79 per share for the quarter. (Complaint ¶ 35.) During a conference call on October 16, 2000, Shipley assured investors that IBP had turned in a solid financial performance for the third quarter and Bond stated that they expected Foodbrands "to have an excellent year." (Complaint ¶ 36.) When IBP's 2000 third quarter Report on Form 10-Q was filed with the SEC on November 7, 2000, there had been a change to the results announced on October 16, 2000:

> In late October 2000, management discovered inaccuracies in a Foodbrands subsidiary's financial statements, resulting in a $9 million reduction in pre-tax earnings and inventories. The third quarter 2000 financial statements included herein include this reduction from amounts previously reported in IBP's earnings press releases on October 16, 2000.

(Complaint ¶ 37.) Peterson and Bond also caused a press release to be issued on November 7, 2000 further explaining that IBP was making a $9 million reduction in pre-tax earnings as a result of inaccuracies in DFG's financial statements. (Complaint ¶ 38.)

A preliminary Form 14-A proxy statement was filed with the SEC on November 28, 2000, which included IBP's financial statements for fiscal year 1999 and the first three quarters of 2000. (Complaint ¶ 40.) The proxy was filed in relation to an offer by Rawhide Holdings[1] to purchase IBP

---

[1] The offer by Rawhide Holdings was a management-led buyout that would have converted IBP to a privately held company. Two defendants in this action, Peterson and Bond, had a financial interest in the buyout offer by Rawhide Holdings.

and it predicted that IBP would post earnings per share of $2.48 for fiscal year 2000. (Id.) Plaintiffs allege Bond, Shipley, Devening and Brady failed to reveal in the proxy that IBP's financial statements remained overstated by at least $21 million despite the $9 million writeoff taken on November 7, 2000. (Id.) Defendants IBP, Peterson, Bond, Shipley and Devening were aware by the time the proxy was issued, argue Plaintiffs, that IBP could not possibly post 2000 earnings per share of $2.48. (Id. ¶ 41.) According to Plaintiffs the "boilerplate disclaimer language" in the proxy was not sufficient to absolve IBP, Bond, Shipley and Peterson from their false statements therein. (Id. at ¶ 40.)

An offer to purchase IBP was made by Tyson Foods, Inc. on December 4, 2000. (Complaint ¶ 42.) In connection with Tyson's offer, IBP filed a schedule 14D-9 Solicitation/Recommendation Statement on December 22, 2000, which Plaintiff alleges was materially false and misleading because IBP needed to record at least a $50 million charge for impairment to DFG's intangible assets and restate earnings per share in an amount at least 300% more than that disclosed on November 7, 2000. (Id. at ¶ 43.) Two amendments to the December 22, 2000 schedule were filed in January 2001, which Plaintiffs allege were also false and misleading because Defendants continued to conceal the information relating to DFG. (Id. at ¶ 47.)

Bond and Peterson communicated with Tyson about the problems with DFG, informing Tyson on December 29, 2000 that IBP's financial statements required a restatement of at least $30-$35 million. (Complaint ¶ 47.) Plaintiffs allege Peterson, Bond and Shipley were aware of the true magnitude of the accounting fraud, but that they attempted to conceal this information from investors in the hope that the Tyson merger would be consummated in late January or early February 2001, allowing them to avoid ever having to disclose the truth about the fraud at DFG and the repercussions thereof, including civil suits or criminal prosecution. (Id.)

On January 25, 2001, it was disclosed to the investing public that the SEC was questioning IBP about the accuracy of its previously reported financial statements. (Complaint ¶ 48.) Investors were also informed that Tyson was assessing the impact of any changes to IBP's financial

statements, resulting in a $4 per share drop in IBP's stock. (<u>Id.</u> at ¶ 49.) On January 26, 2001, IBP confirmed in a fourth amendment to IBP's Schedule 14D-9 that it would need to take an additional charge of up to $47 million and an unidentified charge for the impairment of goodwill on previously reported financial statements. (<u>Id.</u> at ¶ 50.) The ultimate charge totaled $44.9 million. (<u>Id.</u> at ¶ 51, 59.) In addition, IBP recorded a $60.3 million charge to goodwill to write-down its investment in DFG. (<u>Id.</u> at ¶ 73.)

A comparison of IBP's originally reported earnings per share and receivables and IBP's restated earnings per share and receivables is set forth in paragraph 55 of the Complaint. Plaintiffs allege DFG's accounts receivable and prepaid expenses were each overstated by at least $5 million, inventory was falsely inflated and DFG failed to record liabilities for obligations it had incurred. (Complaint ¶¶ 61, 63, 65, 67.) Moreover, Plaintiffs contend Defendants failed to record in a timely manner the loss to goodwill relating to DFG. (<u>Id.</u> at 76-78.) Due to the accounting improprieties alleged in the complaint, Plaintiffs claim IBP's financial statements violated General Accepted Accounting Principles ("GAAP") in several respects identified in paragraph 79 of the complaint.

IBP initiated a lawsuit against Zahn and Sexauer in early 2001 seeking damages for their fraud while employed by DFG. Defendants claim that rather than being perpetrators of fraud, they were the "unwitting victim of a serious fraud" by Zahn and Sexauer. (Brief, Doc. 99 at 2.)

Between January 24, 2001 and March 28, 2001, the price of IBP stock fell over 20% to as low as $22 per share. (Complaint ¶ 53.) Tyson announced on March 29, 2001 that it was terminating the merger agreement due to the restatement of IBP's financial statements, resulting in an additional decline of the price of IBP stock to a low of $15.00 per share. (<u>Id.</u>) On March 30, 2001, IBP filed a lawsuit to enforce the Merger Agreement. <u>See In re IBP, Inc. Shareholders Litig.</u>, 789 A.2d 14, 51 (Del. Ch. 2001). The Delaware Court held that Tyson unlawfully terminated the Merger Agreement and ordered specific performance of the Agreement. <u>See id.</u> at 22-23. It was the finding of the Delaware court that "[t]he Merger Agreement specifically allocated certain risks to Tyson, including the risk of any losses or financial effects from the accounting improprieties at DFG,

and these risks cannot serve as a basis for Tyson to terminate the Agreement." Id. at 23. The court further found that the fraud at DFG was not the true reason for Tyson's termination, rather it was "buyer's regret." Id. at 22. "Tyson wished it had paid less especially in view of its own compromised 2001 performance and IBP's slow 2001 results." Id.

Several Defendants moved to dismiss the Complaint. (Doc. 98). The motion was fully briefed and the Court was preparing the second draft of its opinion on the motion when the parties requested that the Court hold in abeyance a ruling on the motion because they were involved in settlement negotiations. Several months later, on July 21, 2003, the parties submitted a written Stipulation of Settlement. (Doc. 123.) On July 30, 2003, the Court entered an Order Preliminarily Approving Settlement and Providing for Notice, Doc. 126. A fairness hearing was held on December 8, 2003.

## DISCUSSION

A.   Class Certification

On July 30, 2003, the Court preliminarily certified, solely for purposes of effectuating the settlement, a Settlement Class of all persons who purchased IBP, Inc. ("IBP") common stock during the period from February 7, 2000 through January 25, 2001, inclusive, and their respective legal heirs, successors, assigns and representatives. Excluded from the Settlement Class are Defendants, members of the immediate families of the Individual Defendants, any entity in which any Defendant has or had a controlling interest, current or former directors and officers of IBP, and the legal representatives, heirs, successors, or assigns of any such excluded person. Also excluded from the Settlement Class are those persons who timely and validly requested exclusion from the Settlement Class pursuant to the "Notice of Pendency and Settlement of Class Action," or are otherwise excluded by order of the Court.

With respect to the Settlement Class, the Court finds and concludes that: (a) the members of the Settlement Class are so numerous that joinder of all members in this litigation is impracticable; (b) there are questions of law and fact common to the Settlement Class that predominate over any

individual questions; (c) the claims of the Plaintiffs are typical of the claims of the Settlement Class; (d) the Plaintiffs and their counsel have fairly and adequately represented and protected the interest of all of the Settlement Class members and will continue to do so; and (e) certification of a Settlement Class is superior to other available methods for the fair and efficient adjudication of the controversy. See Fed.R.Civ.P. 23(a), (b). Thus, the Court will certify a class consistent with the preliminary certification on July 30, 2003.

### B.    Fairness of Stipulation of Settlement

Rule 23(e) of the Federal Rules of Civil Procedure provides that the Court must approve the dismissal or compromise of a class action. The Eighth Circuit requires the district courts to determine whether a class action settlement is "fair, reasonable and adequate." Effective December 1, 2003, Rule 23(e) was amended to provide that "[t]he court may approve a settlement, voluntary dismissal, or compromise that would bind class members only after a hearing and on finding that the settlement, voluntary dismissal, or compromise is fair, reasonable, and adequate." Fed.R.Civ.P. 23(e)(1)(C) (December 1, 2003).

Before the issue of fairness is addressed, the Court must consider whether the Plaintiffs' change in the plan of allocation from the Court's pre-approved plan of allocation is correct or whether new notices must be sent to class members. There were two changes made to the notice approved by the Court on July 30, 2003. The first change relates to the settle-out price. The settle-out price in the notice approved by the Court on July 30, 2003, was $22.49. Plaintiffs explain that the figure of $22.49 was derived from the limitations of damages provision in § 21D(e) of the PSLRA. Because the share price continued to decline, however, the limitations of damages provision in § 21D(e) does not apply in this case. The correct settle-out price is $24.625, which was the per share closing price on January 25, 2001. Defendants take no position on whether $24.625 is the correct settle-out price, but they recognize the figure of $22.49 was based upon a mistaken application of § 21D(e) to this case.

The second change relates to the exclusion of a recovery in this case for shares purchased during the class period, but sold between March 30, 2001 and June 15, 2001. The plan of allocation approved by the Court did not exclude recovery on these shares. Plaintiffs' primary reason for excluding recovery in this case for such shares is to avoid a double recovery as to those shares in this case and in a class action lawsuit pending in Delaware against Tyson involving Tyson's alleged fraudulent statements. A class has been certified in the Delaware litigation against Tyson, defined as "all persons and entities ... who purchased IBP, Inc. ("IBP") securities on or before March 29, 2001, and subsequently sold those securities during the period from March 30, 2001 through June 15, 2001, inclusive, and who sustained damages as a result of such transactions." See In re: Tyson Foods, Inc. Securities Litig., 2003 WL 22316548, *7 (Oct. 6, 2003). Thus, a class member could recover in this litigation the artificial inflation due to the DFG fraud for any shares purchased during the class period and, if those shares were sold during the class period in the Delaware litigation and the plaintiffs prevail in the Delaware litigation, the class member could recover the amount of the artificial inflation due to the fraud at DFG for a second time.

Defendants contend no double recovery will occur because the two cases involve distinct types of harm. The instant case involves artificial *inflation* of the price of IBP's shares due to the DFG fraud, while the Delaware litigation involves artificial *deflation* of IBP's share price due to Tyson's actions. While the Court agrees the two cases involve distinct types of harm, the measure of damages in both cases starts with the class member's purchase price of the shares at issue. For example, if a share was purchased for $28.625 on January 23, 2001 and the settle out price is $24.625, the class member could theoretically[2] recover $4.00 for the loss on that share in this action. If the same share was sold on April 5, 2001 for $16.000, the class member could theoretically recover $12.625 in the Delaware action, calculated by subtracting the selling price from the purchase price. Thus, the same $4.00 loss recoverable in this action ($28.625 purchase price minus the settle out price of $24.625) is again recoverable in the Delaware action.

---

[2]The term "theoretically" is used because, at least in this action, the entire loss of $4.00 per share will not be recovered based upon the settlement amount.

One method to eliminate this possibility of double recovery would be to limit the recovery in the Delaware litigation to any loss not included in the present action. Neither the Court nor the Plaintiffs in this action, however, have the ability to control the plan of allocation in the Delaware litigation. The method chosen by the Plaintiffs to eliminate the possibility of double recovery is to exclude recovery on any shares for which a class member may be able to recover in the Delaware litigation. Although it is possible the plaintiffs in the Delaware litigation may not prevail, not one class member who may be able to recover in the Delaware litigation objected to the plan of allocation set forth in the actual class notice in this action, which excludes recovery for loss on shares potentially recoverable in the Delaware litigation. Those class members may be willing to wait for a potentially higher recovery in the Delaware litigation because they may consider their chance of recovering a higher percentage of their loss is worth taking the risk. The plaintiffs in the Delaware litigation have been successful in defeating Tyson's motion to dismiss and a class has been certified. See id. Another factor weighing in favor of the Delaware plaintiffs is that a judicial finding has already been made that Tyson wrongfully attempted to terminate the merger agreement.

The Court finds that, although the Plaintiffs should have sought leave of the Court to send a revised notice, the actual notice sent to the class members is not incorrect or inconsistent with the Settlement Agreement. The fairness of the settlement, including the settle-out price and the plan of allocation, will be evaluated based upon the notice Plaintiffs provided to the class members.

The most important factor in the fairness determination is the Court's balancing of the strength of the merits of Plaintiffs' case against the amount of the settlement offer. See Grunin v. Int'l House of Pancakes, 513 F.2d 114, 124 (8th Cir. 1975). Additional considerations are "the defendant's overall financial condition and ability to pay; the complexity, length and expense of further litigation; and the amount of opposition to the settlement." Id. The Court is not required to determine the value of the settlement with absolute precision. See DeBoer v. Mellon Mortgage Co., 64 F.3d 1171, 1178 (8th Cir. 1995). Moreover "[j]udges should not substitute their own judgment as to optimal settlement terms for the judgment of the litigants and their counsel." Petrovic v. Amoco Oil Co., 200 F.3d 1140, 1148-49 (8th Cir. 1999) (quotations and citations omitted). The Court further

recognizes that "[a] strong public policy favors agreements, and courts should approach them with a presumption in their favor." Id. at 1148 (quotations and citations omitted).

The Court is fully aware of the strength and weaknesses of Plaintiffs' case on the merits. Having carefully examined all arguments and evidence presented by the moving Defendants and Plaintiffs, the Court was in the process of preparing its second draft of the opinion on the Motion to Dismiss when the parties requested that the Court hold its ruling in abeyance pending the outcome of settlement negotiations. Plaintiffs faced significant obstacles in establishing scienter on the part of the Defendants possessing the ability to pay any significant damage award. In addition, Plaintiffs faced similar obstacles in proving the amount of depreciation in IBP's stock price related to the securities fraud they alleged as distinguished from the depreciation in IBP's stock price due to the actions of Tyson concerning the merger agreement. Balancing the amount offered in the settlement of $8 million against the strength of the merits of Plaintiffs' case, leads the Court to conclude that this factor weighs heavily in favor of finding the settlement is fair, reasonable and adequate.

The remaining factors also weigh in favor of approving the settlement. The $8 million settlement amount has been paid into an escrow account. Although IBP surely had and has the ability to pay more than $8 million, this does not make the settlement inadequate. See Petrovic, 200 F.3d at 1152. Discovery in this case was stayed upon the filing of the Motion to Dismiss. Thus, if the Plaintiffs' case survived Defendants' motion, the parties would have engaged in extensive discovery and additional motions, likely including class certification and summary judgment, requiring the expenditure of significant additional resources by both sides to the litigation as well as the Court. If Plaintiffs were successful on those motions, a lengthy trial would be required. Finally, the Court received no objections to the Stipulation of Settlement, with the exception of the objection to the amount of attorney fees requested.

Both sides to the litigation were represented by experienced class action counsel and the Stipulation of Settlement was vigorously negotiated at arms-length over several months with the assistance of a mediator. There is no evidence of bad faith or collusion during the negotiation

11

process. See DeBoer, 64 F.3d at 1178 (approving settlement where no evidence of collusion or bad faith during negotiations was present). Having weighed all of the appropriate factors, the Court will approve the settlement as being fair, reasonable, and adequate.

C.    Attorney Fees

Plaintiffs move for an award of attorney fees in the amount of 30 percent of the $8 million settlement fund. Although Plaintiffs initially requested expenses in addition to the 30 percent, the revised request does not seek a separate award for expenses above the requested 30 percent. One written objection to the requested attorney fees was received from Colden Capital Management LLC on December 2, 2003. Colden purchased 150,000 shares of IBP's common stock during the period February 7, 2000 through January 25, 2001. Colden contends that an award of attorney fees totaling 30 percent of the settlement fund would be egregious.

The Court has the discretion to use either the lodestar method or the percentage of the benefit method in determining the proper amount of attorney fees to approve. See Johnston v. Comerica Mortgage Corp., 83 F.3d 241, 246 (8th Cir. 1996). The Eighth Circuit indicated that the percentage of the benefit method is preferred in common fund situations. See id. (citing Court Awarded Attorney Fees, Report of the Third Circuit Task Force (Arthur R. Miller, Reporter), 108 F.R.D. 237 (October 8, 1995)). The Supreme Court indicated that the percentage-of-recovery method was appropriate for common fund cases:

> Unlike the calculation of attorney's fees under the "common fund doctrine," where a reasonable fee is based on a percentage of the fund bestowed on the class, a reasonable fee under § 1988 reflects the amount of attorney time reasonably expended on the litigation.

Blum v. Stenson, 465 U.S. 886, 900 n. 16 (1984) (emphasis added). The Court concludes that the percentage of the benefit method is the proper method for awarding attorneys fees in this common fund case.

The Eighth Circuit has approved the percentage-of-recovery method to evaluate a request for attorney fees in common-fund settlement cases. See Petrovic, 200 F.3d at 1157; In re US Bancorp Litigation, 291 F.3d 1035, 1038 (8th Cir. 2002). An award of 36 percent of the settlement fund was approved by the Eighth Circuit in In re US Bancorp Litig., 291 F.3d at 1038. An award of 24 percent of the monetary compensation to the class was approved in Petrovic, 200 F.3d at 1157. The parties agreed upon an award of 30 percent, including expenses. The Defendants, however, do not have an interest in protecting the interests of the class or negotiating a lower fee for Plaintiffs' counsel. Rather, the Court has the obligation to evaluate the request for attorney fees. Having reviewed the above cases and evaluated counsel for Plaintiffs' request for fees the Court concludes that 28 percent of the settlement amount, which includes the expenses of approximately $207,000.00, is the proper percentage of the settlement fund to award in this case. This case did not involve discovery because the parties settled this action while the motion to dismiss was pending before the Court. The Court finds that Plaintiffs' counsel competently and vigorously represented the class and by reducing the percentage requested does not intend to penalize Plaintiffs' counsel for proceeding efficiently and effectively. Accordingly,

IT IS ORDERED:

1.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, the Court hereby certifies, for purposes of effectuating this settlement, a Settlement Class of all Persons who purchased IBP, Inc. common stock during the period from February 7, 2000 through January 25, 2001, inclusive, and their respective legal heirs, successors, assigns and representatives. Excluded from the Settlement Class are Defendants, members of the immediate families of the Individual Defendants, any entity in which a ny Defendant has or had a controlling interest, current or former directors and officers of IBP, Inc., and the legal representatives, heirs, successors, or assigns of any such excluded person. Also excluded from the Settlement Class are those persons who requested exclusion from the Settlement Class and are identified on Exhibit 1 attached to Plaintiffs' Proposed Final Judgment and Order of Dismissal With Prejudice, Doc. 147.

2.    That the Notice of Pendency and Settlement of Class Action provided to the Settlement Class, together with the published Summary Notice, was the best notice practicable under the circumstances, including the individual notice to all members of the Settlement Class who could be identified through

reasonable effort. These mechanisms provided the best notice practicable under the circumstances of those proceedings, including the proposed settlement, to all persons entitled to such notice, and said notice fully satisfied the requirements of Rule 23 of the Federal Rules of Civil Procedure and the requirements of due process.

3.    That the Stipulation of Settlement, filed with the Court on July 21, 2003, Doc. 123, and the settlement are fair, reasonable, and adequate as to the Settlement Class, and that the Stipulation of Settlement and settlement are hereby finally approved in all respects, and the settling parties are hereby directed to perform its terms.

4.    That Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation of Settlement Proceeds, Doc. 135, is granted.

5.    That Plaintiffs' Motion for Attorney Fees, Doc. 128, is granted in part and denied in part. Representative Plaintiffs' Counsel are awarded attorneys' fees of 28 percent of the Settlement Fund, from which the attorneys will pay their expenses of approximately $207,000.00. The "Settlement Fund" includes any interest earned by the Settlement Fund. Said fees and expenses shall be allocated among Plaintiffs' counsel in a manner which, in Representative Plaintiffs' Counsel's good-faith judgment, reflects each such counsel's contribution to the institution, prosecution and resolution of this litigation. The awarded attorneys' fees, and interest earned thereon, shall be paid to Representative Plaintiffs' Counsel from the Settlement Fund immediately after the date of this Order subject to the terms, conditions and obligations of the Stipulation of Settlement and in particular ¶ 6.2 thereof.

6.    That except as to any individual claim of those persons identified on Exhibit 1 attached to the Plaintiffs' Proposed Final Judgment and Order of Dismissal with Prejudice, Doc. 147, who have validly and timely requested exclusion from the Settlement Class, the Court hereby dismisses with prejudice and without costs (except as otherwise provided in the Stipulation of Settlement) this consolidated action against all Defendants.

7.    That, pursuant to 15 U.S.C. § 78u-4(f)(7)(A), this Order discharges all claims for contribution arising out of this litigation against any of the Settling Defendants brought by other persons and a bar order is hereby entered permanently enjoining and barring all future claims for contribution arising out of this litigation (i) by any Person against any of the Settling Defendants, and (ii) by each of the Settling Defendants against any Person other than a Released Person who is not one of the Settling Defendants. This contribution bar, however in not intended to affect and shall exclude (i) claims by the

14

Settling Defendants against their insurance carriers for reimbursement of any settlement amount paid by or on behalf of Settling Defendants; or (ii) claims for contribution by IBP against any Released Person other than the Settling Parties. The contribution bar shall in no way release or limit any claims that have been or could be asserted by IBP against any former officer, director, employee or agent of Diversified Food Group, LLC for misappropriation, fraud or breach of fiduciary duty, including, but not limited to, claims that have been or could be asserted in IBP v. Andrew J. Zahn and Philip Sexauer, 01 C 6529, pending in the United States District Court for the Northern District of Illinois, or any claims by IBP against its insurance carriers for recovery under applicable insurance policies for loss to IBP caused by conduct by, or at the direction of, any former officer, director, employee or agent of Diversified Food Group, LLC.

8.    Without affecting the finality of the Judgment to be entered in this action, the Court retains continuing jurisdiction over: (a) implementation of this settlement and any award or distribution of the Settlement Fund, including interest earned thereon; (b) disposition of the Settlement Fund; and (c) all parties, including the Settlement Class members, for the purpose of construing, enforcing and administering the Stipulation of Settlement and the Judgment.

Dated this ____ day of February, 2004.

BY THE COURT:

Lawrence L. Piersol
Chief Judge

ATTEST:
JOSEPH HAAS, CLERK

BY: _____
(SEAL)        (DEPUTY)